UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
JOSEPH A. AGOSTINELLO,

                         Plaintiff,

           -against-

GREAT NECK UNION FREE SCHOOL DISTRICT,

                         Defendant.
----------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
CV05-5838 (WDW)

**WALL, Magistrate Judge:**

Before the court is the defendants' motion for summary judgment in a case on consent to the undersigned for all purposes. DE [25]. For the reasons set forth in this Memorandum and Order, the motion is granted in part and denied in part. All claims except the failure to accommodate claim pursuant to the New York Human Rights Law are dismissed, and, as to that remaining state law claim, this court declines to exercise supplemental jurisdiction.

## BACKGROUND

This action commenced on December 15, 2005, with the filing of a Complaint that alleges discriminatory employment practices pursuant to Title VII, the Americans with Disabilities Act, and the New York Human Rights Law. An Amended Complaint was filed on April 16, 2007; on June 4, 2007, the parties filed a Consent to my jurisdiction, and the current motion was filed as fully briefed on March 14, 2008.

The plaintiff, Joseph Agostinello, was employed by the defendant school district as a custodian starting on June 28, 1993. DE [30], Def's. Rule 56.1 Stmt.,[1] ¶1. At a picnic in the late

---

[1]Where the parties disagree on the substance of a factual allegation, the disagreement will be noted, with citation to both the defendant's Rule 56.1 statement and the plaintiff's counter-statement. If no disagreement is noted, there is no substantial disagreement, and citation will be made only to the defendant's Rule 56.1 statement.

summer of that year, Agostinello was involved in a "physical altercation" with a co-worker. Vic LaMattina, a head custodian for the District, told the plaintiff that "We don't do stuff like that around here." *Id.*, ¶¶3-5. The plaintiff asserts that Mr. LaMattina was "referring to the fact that Hispanic people fight." DE [28], Pl's Rule 56.1 Stmt., ¶5.

The defendant asserts that, soon thereafter, the plaintiff "had another altercation" with a co-worker, Freddy Varga. DE [30],¶6. The plaintiff does not deny the altercation, but alleges that Mr. Varga threatened and hit Mr. Agostinello and that Agostinello was injured. DE[38], ¶6. The parties' versions of the Varga incident differ in other ways as well. The defendant's version of the Varga incident leads to its allegation that various District officials were aware that Agostinello engaged in inappropriate conduct and pranks and had a reputation for not telling the truth. Agostinello denies that conclusion and its supporting factual assertions. The parties also disagree as to whether Varga was fired or resigned, but he left the employ of the District after the incident.

In 1995, Agostinello requested a transfer to the District's Maintenance Department. DE[30], ¶18. He worked in that department for some time as a painter, and the defendant claims that the head of that department, Bob Devlin, believed that Agostinello had threatened to shoot him, a perceived threat he reported to Brodus Brown, a head of the Buildings and Grounds Department. DE [30], ¶¶18-21. The plaintiff reports that he never threatened Devlin. DE [28], ¶21. After approximately two months, Devlin told Agostinello that he should transfer back to the custodial staff because his work was not up to par, and the plaintiff did so. DE[30], ¶¶22-23.

In 1996, Agostinello requested a transfer out of Great Neck North High School because of a further incident with Freddy Varga, who no longer worked for the District. *Id.*, ¶¶24-27.

Agostinello objects to the District's use of the word "altercation" in reference to the 1996 Varga incident, saying that there was no altercation, but a threat and attempted assault by Varga against Agostinello. Agostinello says that he requested the transfer because he feared Varga. DE [28], ¶¶25-27. The District granted Agostinello's request and reassigned him to the Lakeville Elementary School, where, the defendant alleges, several of Agostinello's co-workers perceived him as a troublemaker and called him "Crazy Joe." DE [30], ¶¶28-30. Agostinello says that when he was transferred to Lakeville, two employees told him that they heard he had been transferred because he was a troublemaker. DE [28], ¶29. The name "Crazy Joe," he asserts, originally referred to a man named Joe Poscadero, but did eventually apply to Agostinello, along with the name "Puerto Rican Moses." DE[28], ¶30.

Agostinello remained at Lakeville from 1996 to 2003, during which time he received annual performance evaluations, with "fair," "satisfactory," and "good" ratings in various categories. In May 1999, the District reports that Agostinello was the subject of an interdepartmental memo from Richie Meyer "detailing his poor attitude at work." DE [30], ¶38, Ex. J. Agostinello denies this, although a copy of the memo has been produced by the defendant as an exhibit. DE[28], ¶38. A second memo from Meyer two days later set forth "a department official's belief that plaintiff would be a poor choice for an open daytime assistant head position at the North High School, as plaintiff would not likely interact well with the teachers or office staff." DE [30], ¶40, Ex. K. The plaintiff, in response, states that Richie Meyer never told him that Meyer thought he had did not interact well with others. DE [28], ¶40. Various disagreements about Agostinello's evaluations over the ensuing years arose, and the plaintiff refused to sign his evaluations for a few years. DE[28] & [30], ¶41.

In May 2002, Agostinello applied for a promotion to the civil service position of Assistant Head Custodian, and was interviewed by a panel from the Buildings and Grounds Department. DE [30], ¶¶51-54. According to the defendant, the majority of the panel members believed that Agostinello "acted arrogantly and cocky during his May 2002 interview, as well as in his interactions with the department's secretary before the interview," and believed that Agostinello could not be responsible for enforcing District rules in a supervisory capacity because he had not followed them in the past. DE[30], ¶¶55-56. The plaintiff states that he cannot comment on the "beliefs" of the panel, but that the only rules he arguably did not follow were the requirements about signing performance evaluations. DE[28], ¶55-56. Only two of the panel members voted for Agostinello's appointment and his application was denied in favor of applicant Frank Truglio. DE[30], ¶¶57-61.

In August 2002, Agostinello applied for another Assistant Head Custodian position, and he was interviewed by a panel, along with five other applicants. DE[30], ¶¶62-63. The District claims that members of the panel felt that not enough time had passed since his interview in May 2002 to determine if he had changed, and Brodus Brown again felt that Agostinello acted arrogant and cocky at his interview. DE[30], ¶¶65-66. Plaintiff denies that he was arrogant or cocky. DE[28], ¶66. Only one panel member voted in favor of Agostinello's application, and it was denied. The panel chose Kevin Cartwright, who had started work with the District in 1986, seven years before the plaintiff was first hired, but Cartwright was not ultimately hired for the Assistant Head Custodian position because the Nassau County Civil Service Commission ("NCCSC") rules required the District to first try to hire one of the top three scorers on the civil service list, and Cartwright was not one of them. The District ultimately decided not to hire

4

anyone in September 2002.  DE [30], ¶¶ 67-73.  Agostinello states that he was number one on the list and that he was not hired for discriminatory reasons.  DE [28], ¶¶71-72.

In January 2003, the NCCSC issued a new civil service list for the Assistant Head Custodian position, and Agostinello's name did not appear on it.  DE [30], ¶74-75.  The defendant states, and the plaintiff agrees, that Agostinello thought that the District could have extended the prior list, on which his name did appear, but failed to do so.  *Id.*, ¶76.  Agostinello's former attorney wrote to the NCCSC to ask why the prior list had not been extended, and Thomas A. Williams, NCCSC's Executive Director, responded that the NCCSC, and not the school district, has the sole discretion to extend or expire a civil service list.  Pursuant to that discretion, the NCCSC decided to expire the earlier list.  *Id.*, ¶77-81.  Agostinello takes the position that the list was expired because the District requested it.  DE [28], ¶78-79.  The District says that it ultimately hired two candidates from the January 2003 list.  DE [30], ¶82.  The plaintiff says that the District hired more than two people from the list.  DE [28], ¶82.

The plaintiff's Title VII claims are based on national origin or race, with Agostinello identifying himself as Puerto Rican.  *See* Amended Complaint, DE[13], ¶15.  He was born in Pennsylvania to Puerto Rican parents and adopted at the age of 15 by an Italian family.  DE[30], ¶¶83-84.  The defendant states that Agostinello agrees that his surname sounds Italian, "rather than Puerto Rican or Hispanic."  *Id.*, ¶85.  Agostinello does not agree that he ever testified to that.  DE[28], ¶85.  The actual testimony was as follows: "Q: Do you think Agostinello sounds like an Italian name? / Agostinello Answer: Yes."  Ex. E, 85:2-22.  In or about 1994, Agostinello told then District Head Custodian Frank Rom that he was Puerto Rican.  The District claims that Agostinello testified that Rom "seemed surprised."  DE[30], ¶86.  Agostinello agrees that he told

Rom, but not that Rom seemed surprised.  DE[28], ¶86.

When Agostinello started work with the District in 1993, there were other Hispanic employees.  DE[30], ¶88.  The plaintiff agrees, saying that the other Hispanic employees were "a couple of cleaners."  DE[28], ¶88.  The District states that Agostinello has no evidence that he was not promoted because of his race or national origin, relying on Agostinello's deposition testimony.  DE[30], ¶90, Ex. E at p. 131.  Agostinello disputes that assertion, stating that the "cited portions do not support the factual assertions."  DE[28], ¶90.  Agostinello's testimony was that he was never told that the members of the interviewing panels did not vote for him because he was Puerto Rican or Hispanic or had a back problem.  Ex. E, 131:5-18.

In his deposition testimony, Brodus Brown denied that race or national origin played a role in employment decisions about Agostinello, and stated that he had never heard any District employees talk about Agostinello's race or national origin.  DE[30], ¶¶91-92, Ex. G at p. 34.  Agostinello states that he can neither admit nor deny these factual assertions.  DE[28], ¶¶91-92.

In early January 2003, an employee named Andy Ward resigned as the nighttime Assistant Head Custodian at Lakeville, and Sergio Buscaglia, Head Custodian at Lakeville, asked Agostinello to temporarily assume some of Ward's duties.  DE[30], ¶¶93-94.  The District states that these were the duties of a "Lead Custodian," a position that has the additional responsibilities of acting as a liaison with community groups and ensuring that the building is locked at night.  DE[30], ¶¶95-96.  The plaintiff says that there is no such position as "Lead Custodian," and that the job and duties were those of Assistant Head Custodian.  DE[28], ¶¶95-96.  This disagreement underlies one of the plaintiff's claims.  The District states that a Lead Custodian does not have any supervisory responsibilities, while an Assistant Head Custodian

does, and claims that the plaintiff has acknowledged that Sergio Buscaglia specifically instructed him that his new responsibilities did not include supervising other custodians. DE[30], ¶99, Ex. F at 88; Ex. G at 176. Agostinello says that he was told only that he "should not give orders." DE[28], ¶99, Ex. E at 188, 200. After he had been performing his new job duties for twenty days, Agostinello wrote to Brodus Brown and asked that he be paid the salary of an Assistant Head Custodian. The District told the plaintiff that it had not assigned him the duties of an Assistant Head Custodian and would not pay him the Assistant Head Custodian salary, but would pay Agostinello the salary of a Lead Custodian for the time he performed Lead Custodian duties. DE [30], ¶¶97-101.

The plaintiff asserts that his duties were those of an Assistant Head Custodian, and that there was a nighttime custodian, Troy, who required supervision, which Agostinello provided. If a nighttime custodian needed direction, the District maintains, Agostinello should have called the Head Custodian or followed up the next day. As noted, according to the plaintiff, Buscaglia only told him not to give orders, and that there was no protocol regarding how a nighttime custodian should seek direction. DE [28], ¶¶97-101.

Agostinello submitted a formal grievance regarding his claim for Assistant Head Custodian pay. A Step II grievance hearing was held on March 27, 2003, and Agostinello's grievance was denied. The District says the denial was based on Agostinello's having admitted that he was specifically instructed that he was not responsible for the supervision of other custodians. Agostinello maintains that he did not admit that. DE [28] & [30], ¶¶102-104. At his deposition, Agostinello testified as follows: Q: "Did Sergio instruct you not to supervise or instruct your co-workers?" Agostinello Answer: "He said not to give orders." Ex. E at 188.

And, in his written Grievance Step One, he wrote: "Mr. Sergio Buscaglia informed me that . . . I now had the responsibilities of securing the building and taking care of any activities . . . He told me to not give any orders to the night men and/or cleaners in the building, that he would take care of it." Ex. Z.

Agostinello rejected the offer of Lead Custodian pay. He contends that a co-worker, Peter Perillo, previously assumed Lead Custodian responsibilities and was paid at the Assistant Head Custodian rate. The District states that it had previously heard Perillo's grievance and awarded him Assistant Head Custodian pay because he had not been told not to perform supervisory duties, and he did perform those duties. Agostinello did not pursue a Step III grievance, stating that the union failed to take the proper steps. DE[28] & [30], ¶¶105-109.

The plaintiff also makes claims under the Americans With Disabilities Act. *See* Am. Compl., DE[13]. Agostinello claims that he suffers from Grade 1 Spondylolisthesis L5-S1 and a herniated disc with nerve root compression, and that his back problems began in 1995. He received a back brace from the District, and it helped him to perform his work. In 1997 or 1998 (the parties disagree), Agostinello hurt his back and Mr. Challis gave him some work duties that were easier to perform. DE[28] & [30], ¶¶110-114. At some point, Agostinello's brace went missing, and he asserts that Buscaglia gave it to Troy, the part-time employee. He further asserts that he was injured because he had to move furniture without the brace. DE[28] & [30], ¶¶ 116. The District claims that there were hand trucks and a dolly available for the plaintiff's use, but he chose not to use them, but the plaintiff denies that they were available and that he was ordered by Challis to move the furniture. According to the District, it ordered him a new brace; according to Agostinello, the District did not. DE[28] & [30], ¶117 -118. At his deposition, Agostinello

agreed that both a dolly and hand trucks were in the building, but that he did not have access to them.  Ex. E, PP. 110-13.

   Agostinello claims that, in March 2003, he verbally requested a smaller working section, and his supervisor, Sergio Buscaglia, requested a doctor's note.  Agostinello submitted a chiropractor's note dated March 10, 2003, indicating that he could not lift such items as 55 gallon garbage pails or 5 gallon mops, or move heavy items up and down stairs.  DE [28] & [30], ¶¶119-21.  The District claims that it had previously granted the plaintiff an accommodation when he claimed he could not carry garbage bags down the stairs.  DE [28] & [30], ¶122. The plaintiff disagrees, but testified that he was allowed to throw garbage bags out the window rather than carry them down the stairs.  Ex. E, p. 96.  The District states that although Agostinello never provided a doctor's note, he was allowed to throw garbage bags out the second story window after he double bagged them and made them lighter than usual.  DE [28] & [30], ¶¶123-124.  The District construes the March 10, 2003 note from the chiropractor as the plaintiff's first document evincing any limitations in the workplace.  The plaintiff says his letter requesting a back support was the first such document.  DE [28] & [30], ¶126.

   The parties disagree on whether Mr. Buscaglia was willing to work with the plaintiff to accommodate his back problems.  The District states that custodial assignments are generally made in July of each year, and that reassignments are seldom granted in the last quarter of the school year, because it is extremely busy.  DE[28] & [30], ¶¶127-130.  In June 2003, Agostinello went out on Worker's Compensation Leave, and in December 2004, the District asked the plaintiff to let the Personnel Department know by December 22, 2004 whether he planned to return to work, having been out for more than a year.  DE[28] & [30], ¶¶131-132.  When he did

not respond, the District Superintendent wrote to him, by letter dated January 3, 2005, informing Agostinello that the Superintendent would recommend plaintiff's termination as of February 2, 2005. DE[28] & [30], ¶133, Ex. EE. A letter from the plaintiff's doctor dated December 13, 2004[2] stated that Agostinello could return to work in a sedentary, light duty position. DE[28] & [30], ¶134, Ex. FF. The letter also noted that the plaintiff was "Partially disabled, unable to repeatedly bend, lift and carry. Needs to be able to change positions throughout the day." Ex. FF.

The District claims, and the plaintiff disputes, that no light duty custodial positions have ever existed in the department. DE[28] & [30], ¶135. The plaintiff asked to be reassigned to the North Middle School, which had characteristics that would make it easier to do his job. The District offered to reassign him there, an offer that the plaintiff accepted. He returned to work for the District in May 2005. The District states that Agostinello was "fully cleared" by a doctor to return to work. The plaintiff says he was not. DE[28] & [30], ¶¶ 136-140. He agreed at his deposition that he had gotten his doctor's "clearance" before he returned to work. Ex. E, p. 230.

At the North Middle School, plaintiff was supervised by Vic LaMattina, Alan Ratner, and Neil Williams. The District says that it granted all of Agostinello's accommodation requests, but the plaintiff disagrees, saying, for example, that he did not get a floor sink. DE[28] & [30], ¶¶141-142. According to the District, Agostinello was able to perform all of his tasks with the help of painkillers for three months, with less reliance on them afterwards. Agostinello, however, states that he had difficulty performing all tasks, including the removal of scuff marks.

---

[2]It is unclear from the Rule 56.1 statements whether the Superintendent had the doctor's letter when he wrote his letter, or whether Agostinello sent it after the Superintendent wrote to him.

He had typically removed them by "kicking" them out. DE[28] & [30], ¶¶ 143-145. Agostinello claims that Ratner harassed him. DE[28] & [30], ¶146. The District claims that it had trouble finding assignments suitable for the plaintiff to perform. For example, during the summer of 2005, the entire custodial staff was assigned to paint, a typical summer assignment. Agostinello said that he could not paint, so his supervisor assigned him to clean the stairway railings. Agostinello says that the assignment was the result of his telling the supervisor he could not do work on his hands and knees. Whatever the reason, the District says that Agostinello complained that he could not complete the stairway job, but Agostinello says he did complete it. According to the District, he also stated that he could not complete the assigned task of cleaning the emergency door bases. Agostinello disputes that, but points to no evidence in support of his position. DE[28] & [30], ¶¶147-153.

Vic LaMattina couldn't find any other jobs for the plaintiff to do, and called Ed Groshans about the problem. LaMattina finally told Agostinello to "high dust" the stairs, and had his co-workers complete Agostinello's assignment. The plaintiff complained that he was being given jobs that he shouldn't be doing. Once, when plaintiff's assignment involved moving bleachers, his supervisors allowed him to stop and do something that he felt was easier on his back. During the period of time when the plaintiff was complaining that he was unable to do many of the tasks assigned to him, he was observed riding a motorcycle to and from work. DE[28] & [30], ¶¶154-158. The District asserts that, on September 1, 2005, when he arrived at work, Agostinello shouted at his supervisor, believing that his shift had been changed. Agostinello disputes that claim. The supervisors denied changing the shift, but the plaintiff says that Ratner told him a change was possible, depending on Vic LaMattina. Ratner never spoke with Agostinello about

LaMattina's ultimate decision, and plaintiff says that Ratner apologized to him for that. DE[28] & [30], ¶¶159-162.

In December 2005, a teacher asked Agostinello to clean her classroom board, and the District says that he claimed he could not do so with the supplies that the custodial department had provided, so he left a note for the teacher, telling her to order him additional supplies. He says that he told the teacher the supplies were inadequate and she said she would get him the proper supplies, so he was asking her to do so. DE[28] & [30], ¶¶163-164, Ex. KK. In January 2006, when the Principal looked for the plaintiff to ask about a bookcase that needed to be moved, he found him in a locked classroom, reading the newspaper. Agostinello says he was on a break at the time. Agostinello told the principal that he could not move the bookcase, and now says it was "violative of policy and law to dispose of the bookcase" as the teacher had requested. The District states that the principal thought that Agostinello's manner of responding was "dysfunctional," and he told Agostinello that if he could not move the bookcase, he should ask for help from his co-workers. Agostinello says that he could not ask for help because he, alone among the custodians, had been directed never to leave his section.

The District further alleges that the plaintiff, on a date that is not clear from the record, left work without speaking to anyone, claiming that he could not find his supervisor or any of his five co-workers, despite looking for someone for twenty minutes. He says that he left a note and that he left because he did not feel well. DE[28] & [30], ¶¶164-171.

In 2006, the plaintiff applied for a day position at Great Neck South Middle School. The panel interviewed him, and he was chosen, along with two other candidates, to meet with the building's principal. According to the District, Brodus Brown recommended Agostinello for the

job even though Agostinello had "yelled and screamed" at Brown during a verbal confrontation, which the plaintiff denies doing. The principal did not select Agostinello for the position. DE[28] & [30], ¶¶172-175.

By letter dated December 15, 2006, Agostinello resigned from his position with the District. His resignation letter expressed frustration with the District's handling of a complaint by Agostinello that a co-worker named J.P. had threatened him. Agostinello stated that Brodus Brown had spoken with J.P., who claimed that he had "Momentarily lost his head and that it would not happen again." Brown told J.P. to stay in his work area; Agostinello was not pleased. The District notes that there are no references to any harassment and/or discrimination based on national origin, race or disability in plaintiff's resignation letter. The plaintiff disputes that, but does not point to anything in the letter that contradicts the District's assertion. DE[28] & [30], ¶¶ 176-180, Ex. NN. The letter does not mention discrimination based on national origin, race or disability, but states that Agostinello was resigning "due to the relentless verbal, mental, psychological harassment and retaliation" that he had to endure. Ex. NN. He details the incident with J.P. as the reason for his leaving.

At the time of his resignation, the District asserts, Agostinello already had a job waiting for him in the Levittown School District, having applied for it in or about September 2005, and that he did not ask for any accommodations or light duty from Levittown. The plaintiff does not deny this, but notes that although he works at Levittown as an Assistant Head Custodian, he makes less than he did at Great Neck. DE[28] & [30], ¶¶181-183.

Several years before he left the District, on or about February 4, 2003, Agostinello had filed a Charge of Discrimination with the New York State Division of Human Rights and with

13

the EEOC.  In it, he alleged discrimination based on his race, national origin and disability.  Ex. PP.  He did not amend the charge to include any events subsequent to its filing.  On September 29, 2005, the EEOC issued a right to sue notice.  DE[28] & [30], ¶¶184-187.

The District lists several other factual assertions regarding Agostinello's claims against it. He believed he was entitled to additional vacation time in connection with his Worker's Compensation Leave, and the District maintains that he received the additional days.  The plaintiff disputes these claims, without specifics as to why.  The District asserts that Agostinello had difficulty in completing some overtime tasks assigned to him, and that the plaintiff believes that it stopped offering him overtime because he had turned it down in the past.  He told his supervisors that he did want overtime and overtime opportunities were subsequently offered to him.  The plaintiff asserts that he had to file a grievance to receive overtime.  DE[28] & [30], ¶¶188-193.

The plaintiff includes in his Rule 56.1 Counter-statement several paragraphs that do not correspond to the District's factual allegations.[3]  The gravamen of the paragraphs is simply a statement of the plaintiff's claims in this action, citing only to the Amended Complaint, Agostinello's own  deposition and affidavit, and a memo from Agostinello to Superintendent Friedman dated August 12, 2005 as support for the allegations, without reference to other evidence.

---

[3] Eastern District Local Rule 56.1 (b) provides that the counter-statement opposing a motion for summary judgment may include a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.

# DISCUSSION

## Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996). The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash &*

*Rubbish,* 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at 322). A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.,* 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

### Plaintiff's Claims

The plaintiff makes various claims pursuant to Title VII, The Americans With Disabilities Act (ADA), and the New York Human Rights Law (NYHRL). Specifically, he asserts in his Amended Complaint:

> 1) as Count I, a violation of the ADA based on failure to accommodate, Am. Compl., DE[13], ¶¶88-93;
> 2) as Count II, a violation of Title VII, based on Agostinello's national origin, race and color, *id.* at ¶¶94-99;
> 3) as Count III, a violation of Title VII based on retaliatory acts engaged in after the plaintiff filed his EEOC charge, *id.* at ¶¶100-105;
> 4) as Count IV, a violation of the NYHRL, §§296 & 297, based on Agostinello's alleged disability, *id.* at ¶¶106-111;
> 5) as Count V, a violation of NYHRL §§296 & 297, based on Agostinello's national origin, race and color, *id.* at ¶¶112-117; and
> 6) as Count VI, a violation of NYHRL §§296 & 297, based on retaliatory acts engaged in after the plaintiff filed his EEOC charge, *id.* at ¶¶118-123.

The claims are to be analyzed under the *McDonnell Douglas* three step burden shifting analysis. 411 U.S. 792 (1973); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981). If the plaintiff establishes a prima facie case, the defendant must come forward with evidence of a legitimate, non-discriminatory reason for its employment action. If the defendant does so, the plaintiff must then come forward with evidence that the defendant's purported

16

reason is a pretext.

**National Origin and Racial Discrimination Claims Pursuant to Title VII and the NYHRL:**

Here, the defendant does not concede that the plaintiff has established a prima facie case on his claims, but recognizes, as to the national origin/race discrimination claims, the minimal burden on the plaintiff, and focuses instead on its showing of legitimate, non-pretextual reasons for the adverse employment actions he alleges. *See* DE[25] at 3, n.1. Thus, the court will assume for the purposes of this motion that the plaintiff has established a prima facie case as to the race and national origin claims and will examine those claims pursuant to the second and third steps in the McDonnell Douglas analysis. The adverse employment actions underlying those claims are the failure to promote in May and August 2002 and the refusal to pay Agostinello assistant head custodian pay in January 2003. Each employment action will be considered.

Failure to Promote in 2002

The decisions not to promote Agostinello in May or August of 2002, the defendant states, were based on personality issues, without reference to his race or national origin. DE[25] at 3. An employer's problems with a plaintiff's attitude and personality, even where the plaintiff's job performance is otherwise sufficient, can constitute a legitimate, non-discriminatory reason to support an alleged adverse employment action, the defendant argues. *Id.* at 3 (citing *Baldwin v. North Shore University Hospital,* 470 F. Supp. 2d 225, 230-33 (E.D.N.Y. 2007) & *Brierly v. Deer Park U.F.S.D.,* 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005)). The *Brierly* court held that it is well-established that a plaintiff's personality and ability to work with others could be legitimate, non-discriminatory factors that an employer may consider in its employment decisions. *See* 359

F. Supp. 2d at 301 (internal citations omitted); *see also Diaz v. Weill Medical Center of Cornell Univ.,* 2004 WL 285947, *23-24 (S.D.N.Y. Feb. 13, 2004)(stated reasons of plaintiff's interpersonal deficiencies sufficient to meet defendant's burden of production at second *McDonnell Douglas* step).

As explained *supra,* only two of the seven panel members voted in favor of promoting the plaintiff in May 2002, largely because, the defendant claims, the majority believed that Agostinello acted arrogantly during his interview and had not himself followed the rules he would be enforcing with others if he got the job. DE[25] at 5. In support of this claim the defendant relies on the deposition testimony of several individuals. Edwin Groshans, a Deputy Superintendent for Business Affairs for the defendant District, testified that "the head custodian and Frank Rom knew about Agostinello's reputation for getting under people's skin" at around the time he was involved in the dispute with Mr. Varga. Ex. F, 31:2-5. Mr. Groshans also testified that he "knew" those beliefs about Agostinello were true, because "once you meet him, you know him forever." Ex. F, 32:15-17. Groshans also testified that numerous custodians and assistant custodians told him, in conversations over a ten year period, that they wanted "to stay as far away from Agostinello as possible." *See* Ex. F, 32:20 - 33:23. Groshans reported Brodus Brown and Steve Challis telling him that they "never knew when [Agostinello] is not telling the truth." Ex. F 37:11-16.

Brodus Brown testified, *inter alia,* that he thought that Agostinello had started the argument between Agostinello and Varga; that Agostinello got along with his co-workers "just okay at times" and had problems working with people prior to 2002; heard that Agostinello was considered a "troublemaker" and "instigator" at Lakeville School; that Mr. Ratner considered

18

Agostinello a troublemaker at North Middle School; that Agostinello's co-workers at Lakeville and North Middle School considered him a troublemaker; that Bob Devlin told Brown that Agostinello threatened to shoot Devlin in the head; and that the fact that Agostinello is Puerto Rican or Hispanic was not a factor in the voting as to whether he should become a head custodian. Ex. G, 44:20-24; 56:2-58:25; 60:3-23; 63:9-64:66:4;70;8-71:23; 72:3-17; 172:6-8; 173:16-20.

A performance evaluation dated June 1998, completed by Steve Challis and signed by the plaintiff, gives Agostinello his lowest mark, a "Fair," for "relationship with staff." Ex. I. A memo to Frank Rom from Richie Meyer dated May 17, 1999 notes that Agostinello does good work, but that there are questions about his "attitude." Ex. J. Another memo to Rom from Meyer dated May 19, 1999 states that Meyer did not think that Agostinello would be the best person for a day position at North High because he did not interact well with the teachers, office staff, co-workers or Assistant Head Custodians. Ex. K. The performance evaluation for June 1999 completed by Steve Challis and not signed by the plaintiff (who refused to sign it), gave Agostinello satisfactory ratings for his relationships with the public, staff, and supervisors, as did the evaluation for 2000, which Agostinello also refused to sign. Exs. L & M.

This evidence, the defendant argues, demonstrates that at least five of the panel members who voted on Agostinello's promotions had "knowledge" of his "improper behavior, poor judgment and deficient interpersonal relationships with staff and supervisors prior to the interviews." DE[25] at 5. Further, they argue that Agostinello "himself concedes that he had a reputation with the District as a troublemaker and prank puller, and was known to certain custodial staff as 'Crazy Joe.'" DE[25] at 5. While the citations to Agostinello's deposition

transcript cited to by the defendant for this statement do not support a finding that he concedes a reputation as a troublemaker, Agostinello did acknowledge that some people called him "Crazy Joe," "Psycho" and "Mr. Paranoia." Ex. E, 171:13- 172:13.

The court finds on the overall evidence that the defendant has demonstrated legitimate business reasons for its failure to promote Agostinello in 2002. Whether the things that the District employees believed about Agostinello were objectively true or not is irrelevant, and he does deny the allegations about his personality. Nonetheless, the District has amply demonstrated that its employees held those beliefs about Agostinello, and the burden thus shifts to the plaintiff to come forward with evidence showing that these reasons are pretextual.

The plaintiff argues, as a threshold issue, that a trial court must be especially cautious about granting summary judgment to an employer when, as here, its intent is at issue. DE[26][4] at 3 (citing *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir. 1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.)). The plaintiff argues that the defendant manipulated the selection process in ways that provide "powerful evidence establishing pretext." DE[26] at 8. He specifically points out that he had been on civil service lists for the position of Head Custodian since about 1994, and that in 2002, there were about 13 people on list number 76-243. Non-disabled, non-Hispanic individuals were selected from that list, but he was not. He was number one on appointment list 76-243 for July-September interviews, but he learned in

_____

[4]The docket redundantly identifies the plaintiff's memorandum of law in opposition to the motion for summary judgment as both docket number 26 and docket number 27. The court will cite to DE[26]. Missing from the docket is the Plaintiff's Affidavit in Opposition, which the courts surmises was supposed to be docketed as DE[27] but was not. The plaintiff is advised that, should he wish to appeal this decision to the Second Circuit, he must docket the affidavit, which the court has relied on, prior to the record's being sent to the Circuit.

November 2002 that list 76-243 was no longer active. He asserts that the District could have

asked that the list be extended, but did not do so[5]. After list 76-243 was inactivated, the District

hired two Caucasian Assistant Head Custodians. *See* DE[26] at 6-7. The plaintiff also states that

the District failed to post vacancies and disregarded Agostinello's seniority although it was

required to consider it under the relevant Collective Bargaining Agreement. DE[26] at 7. The

plaintiff does not cite to any support in the record for these allegations, however. Finally, the

plaintiff denies that he was ever a troublemaker, had difficult interpersonal skills or was arrogant,

cocky or rude and asserts that there is no paper trail suggesting such personality traits. *Id*.

When, as here, the defendant carries its burden of articulating a clear, reasonably specific,

legitimate, non-discriminatory reason for its employment actions, the plaintiff must prove by a

preponderance of the evidence that the reasons offered by the defendant are a pretext for

discrimination. *Burdine,* 450 U.S. at 248. A plaintiff can establish pretext "either directly, by

persuading the court that a discriminatory reason more likely motivated the employer, or

indirectly, by showing that the employer's offered explanation is unworthy of credence." *Id*. at

156. The Second Circuit has recognized that direct proof of discriminatory intent is not often

found. "Because writings directly supporting a claim of intentional discrimination are rarely, if

ever, found among an employer's corporate papers, affidavits and depositions must be carefully

scrutinized for circumstantial proof, which, if believed, would show discrimination." *Gallo v.

Prudential Residential Svces. Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir. 1994). Thus, a court

should not grant an employer's motion for summary judgment unless the evidence of

---

[5]The District states, and the record reflects, that the Nassau County Civil Service
Commission told Agostinello that it, and not the District, had the sole discretion to extend the list
and chose not to do so. *See* Exs. X & Y.

discriminatory intent is so slight that no rational jury could find in plaintiff's favor. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997). It is not the case, however, that summary judgment is never appropriate in discrimination cases. *Chambers v. TRM Copy Centers Corp.,* 43 F. 3d 29, 32-33 (2d Cir. 1994). "Though caution must be exercised in granting summary judgment where intent is genuinely in issue, [citing to *Gallo*], summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Id.* (citations omitted). "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110.

Here, there is no evidence whatsoever that the District failed to promote Agostinello because of his race or national origin. Even if the record raised questions about whether the District deliberately took actions to insure that they would not have to promote him (as the plaintiff suggests in regard to List 76-243), the inference to be drawn is that they did so because of his personality and not because of his race or national origin. Mr. Agostinello is Puerto Rican. Mr. Agostinello was not promoted. Those two facts do not intersect on a discriminatory path and the District is entitled to judgment as a matter of law dismissing the claims based on failure to promote on the basis of race/national origin, whether those claims are raised under Title VII or the New York Human Rights Law, which is analytically identical to Title VII. *See Aneja v. M.A. Angeliades, Inc.,* 2008 U.S. Dist. LEXIS 30602, *24 (S.D.N.Y. Mar. 31, 2008); *Jean-Louis v. North Shore University Hosp.,* 2007 U.S. Dist. LEXIS 92103, *31-32 (E.D.N.Y. Dec. 14, 2007).

Failure to Pay Assistant Head Custodian Pay in 2003

The District asserts that when the Assistant Head Custodian at the Lakeville Elementary

School resigned in January 2003, Head Custodian Sergio Buscaglia asked Agostinello to assume the duties of a Lead Custodian. DE[25] at 7-8 (citing to Exs. F, G, and Z). The difference between a lead custodian position and an assistant head custodian position is that a lead custodian has no authority to supervise the custodial staff, and an assistant head custodian has such authority and is paid more. In a letter captioned "GRIEVANCE STEP ONE," dated January 30, 2003, Agostinello acknowledges that when he took over the relevant duties, Mr. Buscaglia told him that he should not give any orders to the staff and that Buscaglia would take care of that. Ex. Z. The grievance letter lays out Agostinello's reasoning for why, despite that direction from Buscaglia, he thought that he deserved to get assistant head custodian rather than lead man pay. Agostinello reports that Pete Perillo, a Caucasian man who had earlier performed the job that Agostinello took over, was paid at the higher rate. The District explains that it had to pay Perillo the higher rate because testimony at Perillo's grievance hearing established that Perillo's supervisors failed to tell him not to perform supervisory duties and he did perform them. Ex. F at 135-36. Thus, the District has come forward with a legitimate business reason for their decision not to pay Agostinello the higher pay rate.

The plaintiff has come forward with no evidence that the reason is pretextual and that the real reason was discriminatory. The question of whether Agostinello deserved higher pay is not before this court; the question of whether the higher pay was denied him for discriminatory reasons is, and the plaintiff has not met his burden on that issue. Thus the District is entitled to judgment as a matter of law on that claim, both under Title VII and the NYHRL.

To the extent, if any, that the plaintiff is arguing that he was not promoted in 2002 or paid more in 2003 because he was disabled, the court finds that he has proffered no proof in support

of that claim, that the District has established legitimate business reasons for their actions, and such claim must be denied on that basis as well. Such a claim is distinct from the plaintiff's failure to accommodate claims under the ADA and the NYHRL, which rest on different facts and are addressed *infra*.

**Disability Discrimination Claims**

Agostinello alleges that the defendant failed to reasonably accommodate his back problems and thus violated the ADA and the NYHRL, both of which prohibit discrimination against persons with disabilities in the terms, conditions and privileges of employment. *See* 42 U.S.C. §12112(a); NY Exec. Law §296(a). It also appears that the plaintiff is claiming that he was constructively discharged based on disability discrimination.

<u>Plaintiff's Claims Under the ADA:</u>

To establish a prima facie case of disability discrimination under the ADA, the plaintiff must prove: (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without a reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *See* 42 U.S.C. §12111, *et seq.*; *see also Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 870 (2d Cir. 1998). The defendant asserts that Agostinello cannot establish a prima facie case here because he does not suffer from a disability under the ADA, that is, that his condition does not substantially limit one or more of his major life activities. *See, e.g., Felix v. NYCTA,* 324 F.3d 102 (2d Cir. 2003).

The Amended Complaint states that Agostinello is limited in the major life activities of "lifting, pushing, pulling, bending and squatting." Ex. C, ¶20. The defendant takes the position

that the alleged major life activity is, in fact, working. DE[25] at 11. The defendant correctly argues that it is "well settled" that the inability to lift heavy objects does not constitute a disability under the ADA. DE[25] at 12; *see Colwell v. Suffolk County Police Dep't,* 158 F.3d 635 (2d Cir. 1998) (plaintiff who could lift light objects but not very heavy objects failed to demonstrate substantial limitation on major life activity); *Glozman v. Retail, Wholesale & Chain Store Food Employees Union, Local 338,* 204 F. Supp. 2d 615, 621 (S.D.N.Y. 2002); *Epstein v. Kalvin-Miller Int'l, Inc.,* 100 F. Supp. 2d 222, 227 (S.D.N.Y. 2000); *Strassberg v. Hilton Hotels Corp.,* 1997 WL 531314, *2 (S.D.N.Y. Aug. 28, 1997), *aff'd,* 173 F.3d 846 (2d Cir. 1999). Limitations on pushing, pulling and bending have also been found not to constitute substantial limitations on major life activities. *See, e.g., Rider v. General Motors Corp.,* 2006 WL 1520084, *7 (W.D.N.Y. May 26, 2006). The plaintiff cites to no caselaw refuting these legal principles and the court agrees that the limitations on activities as set forth by the plaintiff in his Amended Complaint - lifting, pushing, pulling, bending and squatting- are not major life activities under the ADA.

If Agostinello's major life activity is viewed as working, the defendant argues, he also cannot make out a prima facie ADA case, because, as the United States Supreme Court has found, a plaintiff alleging working as a major life activity must allege that he is unable to work in a broad class of jobs rather than a particular job. DE[25] at 11 (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491 (1999). The Second Circuit has held that a plaintiff who can only establish "the inability to perform a single, particular job" has failed to establish a substantial impairment to his major life activity of working. *Muller v. Costello,* 187 F.3d 298, 312 (2d Cir. 1999)(citing 29 C.F.R. §1630.2(j)(3)(i)(1997)). The plaintiff does not challenge these legal

principles and has not alleged any broad class of jobs that he is unable to work in. Indeed, he left his employment at the defendant District to take a job as with the Levittown School District, where he now works as an Assistant Head Custodian, allegedly without any accommodations for his back problems. For these reasons, the court finds that he has not established a disability that substantially limited a major life activity under the ADA.

The plaintiff's failure to demonstrate that he suffers from an impairment that substantially limits a life activity under the ADA does not preclude him from obtaining relief under that statute if he proves that "he was, notwithstanding, 'regarded as having such an impairment.'" *Caruso v. Camilleri,* 2008 WL 170321, *18 (W.D.N.Y. Jan. 15, 2008). Agostinello claims that he was so regarded. DE[26] at 12. If not, the plaintiff argues, the District would not have offered him accommodations. The defendant disputes this, arguing that it is not sufficient to demonstrate that an employer recognized some impairment on the part of the plaintiff. Instead, it argues, the plaintiff must show that the District believed he was "disabled within the meaning of the ADA," that is, that he had a physical impairment that substantially limited one or more life activities. DE[29] at 6 (citing *Siederbaum v. City of New York,* 309 F. Supp. 2d 618, 624 (S.D.N.Y. 2004)(internal citations omitted). The court agrees. *See Caruso*, 2008 WL 170321 at *18. Here, the plaintiff's sole argument in support of his "regarded as" claim is that the District would not have offered him accommodations if it had not believed him to be disabled under the ADA. He does not point to a single specific fact or case to support his claim, and the court finds that the claim must fail. Thus, all ADA claims must be dismissed.

<u>Disability Discrimination Claim under the NYHRL</u>

"Disability " is more broadly defined under the NYHRL than the ADA because, unlike the ADA, the NYHRL does not require the employee to demonstrate that a physical or mental impairment substantially impairs a major life activity. Rather, the NYHRL requires only that the disability is a "demonstrable impairment." *Caruso*, 2008 WL 170321 at *32 (citing *Matya v. Dexter Corp.*, 2006 WL 931870, *8 (W.D.N.Y. Apr. 11, 2006)). Specifically, under the NYHRL, a plaintiff is disabled if he suffers from (1) a physical, mental or medical impairment of "anatomical, physiological, genetic or neurological" origin that impairs normal bodily functions or is "demonstrable by medically accepted clinical or laboratory diagnostic techniques," (2) "a record of such an impairment," or (3) a condition that others perceive as impairing the plaintiff. *See* NY Exec. Law §292(21).

The Second Circuit has noted that the federal courts in New York are bound by the construction of New York State law, and that the New York Court of Appeals has confirmed that the definition of a disability under New York State Law is not coterminous with the ADA definition. *Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir. 2001). The Second Circuit has also noted that "in the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York." *Id.* A district court may decline to exercise supplemental jurisdiction over a state law claim where, *inter alia*, the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. §1367(c). As set forth *infra* in this Order, all federal claims are dismissed. Thus, this court declines to exercise supplemental jurisdiction over the state law failure to accommodate claim.

This does not represent a finding that there are material issues of fact regarding that claim. There may or may not be such issues - we leave that to the state court to determine.

**Hostile Work Environment Claim:**

In his Amended Complaint, the plaintiff alleges that he was subjected to a hostile work environment, which was motivated by his "race, color, national origin, disability, his need to be reasonably accommodated and because he engaged in prior protected activity. . ." DE[13] at ¶64. A work environment is hostile " when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Torres v. Pisano,* 116 F.3d 625, 630-31 (2d Cir. 1997) (internal citations omitted). To establish a hostile work environment and support his claim that his resignation in 2005 was really a constructive discharge, the plaintiff must demonstrate a work environment that is "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Ferraro v. Kellwood Co.,* 440 F.3d 96, 101 (2d Cir. 2006)(citing *Pennsylvania State Police v. Suders,* 542 U.S. 129, 141 (2004)). When analyzing a hostile work environment claim, courts should consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767-68 (2d Cir. 1998).

Here, the hostile work environment claim is brought, presumably, under both the ADA and Title VII. The court has found no evidence at all of any discriminatory acts under Title VII, and certainly no proof of a hostile environment pursuant to that statute. The court will focus,

therefore, on the claim under the ADA[6]. Although the Second Circuit has not held that the ADA authorizes claims for hostile work environment, district courts have found that the ADA encompasses such claims. *See Monterroso v. Sullivan & Cromwell,* 2008 WL 4761922, at *10 (S.D.N.Y. Oct. 28, 2008)(citations omitted). The standard, however, is a"a demanding one, and the plaintiff must establish that the alleged harassment was "offensive, pervasive and continuous enough" to create an abusive working environment. *Id.* (citations omitted); *see also Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997) ("Incidents must be more than episodic, they must be sufficiently continuous and concerted in order to be deemed pervasive.")(internal citations omitted).

In his memorandum of law in opposition to the motion for summary judgment, the plaintiff cites to various principles of law in support of his hostile work environment claim, but does not specify factual details allegedly supporting the claim, instead referring the court generally to "the record herein." DE[26] at 21. The plaintiff does, in his affidavit and in his supplemental statement of facts pursuant to Local Rule 56.1, list factual allegations that the court assumes comprise the factual allegations of hostile work environment. Having reviewed these allegations, the court finds that they are not acts that were so offensive, pervasive and continuous that they created a hostile work environment. Most of the allegations concern the District's alleged failure to accommodate, but the jobs that the plaintiff says he was asked to do - sweep hallways twice a day, clean three floors of hand railings, clean door plates and emergency door bases and paint floorboards- are well within the range of activities that an employer could

_____

[6]The plaintiff does not allege, and the defendant does not mention, any hostile work environment claim under the NYHRL. To the extent that such a claim was intended, it would fail for the same reasons set forth herein.

reasonably ask a custodian to perform. While these details may or may not rise to a level of failure to provide accommodations, they do not rise to a level of hostile work environment.

Nor do the spoken remarks reported by Agostinello. He alleges that his supervisors told him that he was crazy, would never be a supervisor, and needed psychiatric help. Such comments, while unpleasant, were mere offensive utterances, and nowhere near egregious enough to create a hostile work environment. The same is true of Agostinello's vague allegations that the District denied him overtime and subjected him to "unfair and unjustified personnel actions." For these reasons, the hostile work environment claim is dismissed.

**Constructive Discharge Claim:**

The plaintiff alleges that his resignation from the District in December 2006 was a constructive discharge, done because his working conditions had become hostile, unsafe and intolerable, and any reasonable person in his place would have had no choice but to resign. Pl's Aff., ¶¶70-74. Constructive discharge of an employee can occur when, rather than directly discharging an individual, an employer intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. *Terry v. Ashcroft,* 336 F.3d 128, 151-52 (2d Cir. 2003)(citations omitted). The Plaintiff must produce evidence that his employer wanted him to resign and made the conditions of his employment so onerous that he was forced to do so. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 231 (2d Cir. 2004); *Gronne v. Apple Bank for Savings,* 2000 WL 298914, *9 (E.D.N.Y. Feb. 14, 2004)(plaintiff not constructively discharged where employer made efforts to resolve plaintiff's difficulties).

The Second Circuit has held that "working conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes

would have felt compelled to resign.'" *Terry,* 336 F.3d at 152 (quoting *Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir. 1996)). Here, as noted *supra*, the plaintiff has not presented evidence of acts that rose to the level of a hostile work environment, and also has not presented evidence of working conditions so intolerable that he was forced to leave. Indeed, the record is rather bare of factual details for the year or so prior to the plaintiff's resignation in December 2006, and the court finds that his resignation was just that - a voluntary departure- and not a constructive discharge.

**Retaliation Claims:**

The plaintiff asserts claims of retaliation pursuant to Title VII and NYHRL §§296 & 297, based on alleged acts subsequent to his filing of the EEOC charge in 2003. *See* Am. Compl. DE[13], ¶¶100-105 & 112-123. He does not assert a retaliation claim pursuant to the ADA. Those statutes prohibit retaliation against any employee who makes a complaint against his employer regarding any practice made unlawful by those statutes. *See* 42 U.S.C. §2000-e3(a); N.Y. Exec. Law §296(e). The statutes are governed by the same standards. *See Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002).

Claims of retaliation are analyzed using the *McDonnell Douglas* burden-shifting framework discussed above. Under that framework, a plaintiff has the initial burden of establishing a prima facie case of retaliation by showing (1) that the plaintiff engaged in a protected activity; (2) that the employer was aware of this activity; (3) that the employer took an adverse action against the plaintiff; and (4) that a causal connection exists between the alleged adverse action and the protected activity. *Treglia*, 313 F.3d at 719. The plaintiff may prove causation either "(1) indirectly, by showing that the protected activity was followed closely by

discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Board of Education,* 232 F.3d 111, 117 (2d Cir. 2000). Once the plaintiff establishes a prima facie case, a de minimus burden, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the challenged employment action. If it does so, the burden returns to the plaintiff to "point to evidence that would be sufficient to permit a rational fact-finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Treglia* at 719 (internal citations omitted).

Here, the plaintiff claims to have cited "a host of protected activity, including, but not limited to, the State Division of Human Rights filing and the commencement of this action," as well as letters of complaint in 2005 and his requests for accommodations. DE[26] at 22. The EEOC filing was in February 2003, the letters of complaint from September to December of 2005, the commencement of this action in December 2005, and the request for accommodations at various unspecified times over a period of years.

The defendant argues that the plaintiff cannot establish a causal connection between any protected activity and allegedly retaliatory adverse employment actions and that the claims must be dismissed for that reason. To assess the causation argument, the court must first determine precisely what retaliatory employment actions the plaintiff alleges. The court notes as a threshold issue that the plaintiff alleges that retaliatory behavior occurred after he filed his EEOC charge in February 2003. Thus, any acts by the defendant prior to that date, including the failure to promote in 2002 and the failure to pay head custodian pay in January 2003 are irrelevant to the retaliation claim. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995). The defendant

takes the position that the only allegedly retaliatory adverse employment action relied on by the plaintiff that occurred after February 2003 is Agostinello's departure from its employ, which the District characterizes as a resignation, and the plaintiff characterizes as a constructive discharge.

The court has already found that Agostinello was not constructively discharged, and thus his departure from the District's employ is not an adverse employment action. Even assuming for purposes of the retaliation claims that Agostinello was constructively discharged and such discharge is an adverse employment action, such action was too far removed from the nearest protected activity to meet the temporal requirement of retaliation claims. He resigned in December 2006. The last arguable protected activities in the record are the commencement of this action on December 15, 2005 and a letter dated December 1, 2005 from Agostinello to the District's Board of Education President, Lawrence Gross. In the letter, the plaintiff recounts various alleged violations of his employment rights. Pl's Exs. [DE27], Ex. 4. Agostinello's resignation was a year later.

In the Second Circuit, there is no bright line rule identifying the point at which temporal proximity becomes too attenuated to sustain a charge of retaliation. *Caruso,* 2008 WL 170321 at *27. However, the defendant argues that courts have held that the temporal proximity between the protected activity and the adverse employment action must be "very close." DE[25] at 20 (citing *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (listing cases and finding that cases that accept mere temporal proximity between employer's knowledge of protected activity and adverse employment action as sufficient evidence of causality uniformly hold that the temporal proximity must be very close); *Stuevecke v. New York Hosp. Med. Ctr.,* 2003 WL 22019073 at *5 (E.D.N.Y. Aug. 26, 2003) (protected activity and termination

"occurred more than five months apart - a period which is too distant to permit a jury to find a causal connection between the two events based on time proximity"); *Lewis v. Snow,* 2003 WL 22077457 at *8 (S.D.N.Y. Sept. 8, 2003) (plaintiff failed to make a showing of protected activity where there was three month gap between alleged activity and alleged retaliatory treatment); *Sussle v. Sirina Protection Sys. Corp.,* 269 F. Supp. 2d 285, 315-16 (S.D.N.Y. 2003) (four month interval insufficient evidence of causal connection). Thus, this court finds that there is insufficient temporal proximity between the alleged constructive discharge and the closest-in-time protected activity to sustain the retaliation charge.

The court next looks to whether there were any other adverse employment actions, closer in time to protected activities, that might support the claims. Adverse employment action has been defined as a "materially adverse change in the terms, privileges, duration and conditions of employment." *Treglia,* 313 F.3d at 720; *see also Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999) (defining adverse action to include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay and reprimand"). Adverse employment actions are not limited to "pecuniary emoluments." *Treglia,* 313 F.3d at 720 (internal citations omitted). The analysis of Agostinello's claimed employment actions is difficult, however, inasmuch as it is impossible to determine from the plaintiff's memorandum of law in opposition to the motion for summary judgment precisely what he believes were adverse employment actions for purposes of his retaliation claims. Both the Amended Complaint and the plaintiff's affidavit in opposition to the summary judgment motion expressly label only the constructive discharge as an adverse

employment action that occurred after the filing of the EEOC complaint in February 2003[7].

The court notes that the plaintiff alleges in his undocketed affidavit that the defendant "denied him overtime opportunities." Pl's Aff at ¶64.  Such a denial might amount to an adverse employment action, but the plaintiff has provided no or insufficient detail to allow the court to assess whether it was one.  He also claims that after he returned to work in May 2005, the defendant took 28 days of accrued time from him and refused to restore it. Pl's. Aff, ¶60.  As with the claim of denied overtime, there is no explanation or detailing of this claim, and no evidence to support it.  Thus, the court will not consider either of those alleged actions to be adverse employment actions for the purposes of the retaliation claim.

Finally, the plaintiff recounts numerous details of adverse treatment of him by employees of the District.  *See* Pl's. Aff. ¶¶ 33-69; Pl's Rule 56.1 Counterstmt., Additional ¶¶30-40. However, all of the actions asserted, with the exception of the overtime and accrued leave claims, relate to the District's alleged failure to accommodate Agostinello, and/or to the creation of a hostile work environment and they are properly considered in the context of those claims. Agostinello does not assert that any of these acts relate to the retaliation claim[8], and the court

---

[7]The plaintiff does allege that the failure to promote and the failure to pay head custodian salary, both of which occurred prior to his earliest protected activity, were adverse employment actions, but they are temporally irrelevant to the retaliation claims because they occurred prior to any protected activity.  *See* Agostinello Aff., ¶¶24 & 32.  Those actions could not, in any event, support a successful retaliation claim, because, under the applicable *McDonnell Douglas* analysis, they were legitimate business decisions.

[8]The plaintiff clearly knows enough to label an action as an adverse employment action when he believes it is one, as is the case with the failure to promote, the failure to adjust his pay, and the constructive discharge.  His failure to label any of the other acts in that way also leads to the court's determination that no other retaliatory adverse employment actions are alleged or exist.

finds that they do not, particularly in light of the fact that he has not made a retaliation claim pursuant to the ADA. *See* Am. Comp. DE[13].

Plaintiff's retaliation claims under the NYHRL are subject to the same analysis as his federal law retaliation claim. *Caruso*, 2008 WL 170321 at *34 (citing *Weissman v. Dawn Joy Fashions,* 214 F.3d 224, 234 (2d Cir. 2000)). Because the plaintiff has failed to establish a prima facie case of retaliation, the court finds that all of the retaliation claims must be dismissed.

## CONCLUSION

The court finds that the defendant District is entitled to judgment as a matter of law, dismissing all claims except for the failure to accommodate claim pursuant to the New York Human Relations Law. As to that claim, the court declines to exercise supplemental jurisdiction.

Dated: Central Islip, New York
     February 2, 2009

**SO ORDERED:**

 /s/ William D. Wall          
WILLIAM D. WALL
United States Magistrate Judge